IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 1:06-CR-21 (RBW) |
| KEVIN MORRIS, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT KEVIN MORRIS' MOTION FOR SUPPRESSION OF COMMUNICATIONS UNLAWFULLY INTERCEPTED AND EVIDENCE DERIVED FROM ILLEGAL ELECTRONIC SURVEILLANCE

NOW COMES the Accused Kevin Morris, by and through undersigned counsel, respectfully moving this Court, pursuant to 18 U.S.C. §§ 2515 and 2518, for an order suppressing all intercepted communications and any evidence derived from illegal electronic surveillance.  In support of this motion, the Accused states as follows:

## INTRODUCTION

This motion concerns approximately four months worth of electronic surveillance used to investigate a purported drug conspiracy in the District of Columbia.  The first application for electronic surveillance and affidavit in support of the application was filed on September 21, 2005 and granted by the District Court.  The target of the investigation was the cellular phone of Kevin Morris.  On October 22, 2005, the government submitted another application and affidavit, which the Court granted, targeting Mr. Morris' new cellular phone.  On November 22, 2005, the government filed and the Court approved another application and affidavit, targeting the cellular and land-line phones of Cinquan Blakney.  On December 22, 2005, the government sought and received an extension of surveillance of Mr. Blakney's cellular and land-line phones.

Each affidavit alleges that there is probable cause to believe that Mr. Blakney, Mr. Morris, Donovan Bostick, and Antoine Jones have committed the offenses of possession with intent to distribute, a conspiracy to possess with intent to distribute, use of communications facilities to commit these offenses, and money laundering.

**MEMORANDUM OF LAW IN SUPPORT OF SUPPRESSION OF ILLEGALLY INTERCEPTED COMMUNICATIONS AND EVIDENCE DERIVED THEREFROM**

The wiretapping statute proscribes the use of "any wire or oral communication [that] has been intercepted, [or any] part of the contents of such communication and [any] evidence derived therefrom" from being introduced as evidence at any official proceeding, if the wire and oral communications were illegally intercepted, in violation of the wiretapping statute.  18 U.S.C. § 2515.  Therefore,

> [a]ny aggrieved person in any... proceeding... before any court... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that (I) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face, or (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).  The Accused suggests to this Court that the communications were unlawfully intercepted because the government failed to satisfy the necessity requirement and failed to adequately follow the minimization requirement.

## I.    THE INTERCEPTED COMMUNICATIONS AND EVIDENCE DERIVED THEREFROM SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT HAS FAILED TO SATISFY THE NECESSITY REQUIREMENT

18 U.S.C. § 2518(1)[c] states that each application for authorization of electronic surveillance shall include "a full and complete statement as to whether or not other

2

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous...."  As such, a judge may only approve such application for electronic surveillance if the judge finds that "the facts submitted" in the application demonstrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous...." 18 U.S.C. § 2518(3)[c].  Such a determination "is referred to as the 'necessity requirement,' and it is the 'keystone of congressional regulation of electronic eavesdropping.'" United States v. Carter, 449 F.3d 1287, 1292 (D.C. Cir. 2006) (quoting United States v. Williams, 580 F.2d 578, 587-88 (D.C. Cir. 1978)).

Essentially, the necessity requirement ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  Therefore, a court should "give close scrutiny to a contested wiretap application and [should] reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." Carter, 449 F.3d at 1293 (citations and quotations omitted).  However, the necessity requirement does not mandate that the government attempt every imaginable method of investigation.  "[T]he government will meet its burden of demonstrating necessity if it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." Id.

In <u>United States v. Ippolito</u>, the Ninth Circuit found that:

Although the government need not pursue every alternative means of investigation, neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective. It is not unreasonable to expect the government to utilize those methods that appear to be potentially productive. We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some 'normal' investigative strategies that were unproductive, where more fruitful investigative methods were available.

774 F.2d 1482, 1486 (9th Cir. 1985). Specifically, the <u>Ippolito</u> court found that where "there was an informer who was both willing to testify and had great potential for uncovering the entirety of the conspiracy under investigation," the government failed to show necessity. <u>Id</u>. at 1486-87.

Material to this case, the District of Columbia Circuit held that "we must be careful not to permit the government merely to characterize a case as a 'drug conspiracy' ... that is therefore inherently difficult to investigate. The affidavit must show with specificity why in this particular investigation ordinary means of investigation will fail." <u>United States v. Robinson</u>, 698 F.2d 448, 453 (D.C. Cir. 1983) (superseded by statute on other ground).

**A.    The Government Failed to Adequately Use Reliable Cooperating Witnesses and Confidential Sources that Could Have Uncovered the Entire Alleged Conspiracy Without Need for Electronic Surveillance**

As in <u>Ippolito</u>, in this case the government had a variety of cooperating witnesses and confidential sources, contradicting the necessity of electronic surveillance. These cooperating witnesses and confidential sources would have been able to provide the government information concerning the entire conspiracy without need to resort to

4

electronic surveillance.

### 1.    September 21, 2005 Affidavit

In the September 21, 2005 affidavit in support of the application for electronic surveillance of Mr. Morris' cellular phone, the FBI agent lists three cooperating witnesses (hereinafter "CW's") and confidential sources.  CW 1 is described as being reliable and as available to testify.  (Sep. 21, 2005 Affidavit 11).  The affiant describes CW 1 as having "provided information that is only known by the subjects and targets of this investigation." (Sep. 21, 2005 Affidavit 11).  CW 3 is described as having "provided information about numerous subjects of this investigation and provided relevant phone numbers" and is willing to testify.[1]  (Sep. 21, 2005 Affidavit 11).  Moreover, Confidential Source 4 "has identified numerous subjects of this investigation and has provided pertinent telephone numbers of subjects and targets of this investigation."  (Sep. 21, 2005 Affidavit 12). Confidential Source 4, seemingly very effective at his job, "has provided information resulting in the arrest of over 20, and the conviction of over 10 individuals" and has always provided truthful information.  (Sep. 21, 2005 Affidavit 12).

Here, even thought the affiant was concerned with the fact that CW 2 had refused to continue to testify and the fact that the other cooperating witnesses were drug users, there is no indication that these confidential witnesses and the reliable confidential source could not discover the scope of the conspiracy through undercover drug buys and buy-bust

---

[1] Cooperating Witness 2 had provided reliable information, but the law enforcement agents had lost touch with him/her.  (Sep. 21, 2005 Affidavit 11).

techniques. In fact, the government implies that it had cooperating witnesses in a position to purportedly buy some quantities of drugs from Mr. Morris, just no cooperating witnesses "who are in a position to buy drugs directly from Morris or Blakney in significant quantities." (Sep. 21, 2005 Affidavit 24-25).

Moreover, the government had no need to find out information about Mr. Morris' supplier, as a person, in a 2004 interview, indicated that Blakney supplied heroin to Mr. Morris. (Sep. 21, 2005 Affidavit 16). Simply stated, the government did not have the necessity for a wiretap on Mr. Morris' phone where cooperating witnesses, who the government admits were reliable, were available to participate in undercover drug buys and buy-bust techniques.

## 2.    October 21, 2005 Affidavit

The October 21, 2005 Affidavit indicates that the government had more reliable, cooperating witnesses under its employ than in September. CW 1 was stopped after purportedly buying heroin from Mr. Morris and "provided agents with information that confirmed it had purchased heroin" from Morris. (Oct. 21, 2005 Affidavit 11). Furthermore, CW 1, who has never provided information that had proven to be false, indicated that he had bought heroin in such a manner approximately one hundred times over the past two years. (Oct. 21, 2005 Affidavit 12). CW 2 had stated that he had bought heroin on approximately fifty different occasions and had "personally transacted" with Morris on a few occasions. (Oct. 21, 2005 Affidavit 12). Furthermore, the government utilized CW 3 to make "at least two controlled purchases of heroin from Kevin Morris."

(Oct. 21, 2005 Affidavit 13).  Finally, CW 4 has indicated that he has known Mr. Morris all of his life and has bought heroin from him on at least 600 occasions.

This list of cooperating witnesses indicates that the government had a strong crew of undercover witnesses who had easy and intimate access to Mr. Morris.  The witnesses purportedly bought heroin off of Mr. Morris hundreds of times and one witness had known Mr. Morris all of his life.  Where the cooperating witnesses are so intimate and familiar with the target of the investigation, electronic surveillance is unnecessary.  The government would be able to obtain the same type, quality and quantity of information from the traditional use of these cooperating witnesses.  Essentially, there was nothing that the government could learn from the wiretaps, that had not already been learned or could not further be developed by the cooperating witnesses.  These cooperating witnesses purportedly bought drugs off of Mr. Morris and also purportedly reported that Mr. Blakney was his supplier.  In such a case, there is no necessity for the use of wiretaps.

**B.    The Government Failed to Show that Other Forms of Traditional Investigative Techniques Would Not Suffice to Satisfy the Investigatory Goals**

**1.    Physical Surveillance**

The affiants claim that physical surveillance has been attempted with only limited success and that this investigative technique does not seem to be fruitful for the future.  (Sep. 21, 2005 Affidavit at 22 and Oct. 21, 2005 Affidavit at 29).  First, the affiants claim the 'horseshoe' shape of the road leading to the housing complex where the drugs are

allegedly sold prevents the officers from being able to successfully use physical surveillance. (Sep. 21, 2005 Affidavit at 22 and Oct. 21, 2005 Affidavit at 29). Thus, the affiants claim that the drug dealers can easily spot unmarked police cars and egress from the complex before the police arrive. (Sep. 21, 2005 Affidavit at 22 and Oct. 21, 2005 Affidavit at 29). However, such a claim rings a little disingenuous, as investigating officers routinely disguise themselves and their vehicles as to evade detection.

Furthermore, the affiants admit that they have information from a confidential witness, that at times there are lines of over 20 cars waiting to purportedly buy drugs from Mr. Morris and other co-conspirators. (Sep. 21, 2005 Affidavit at 23 and Oct. 21, 2005 Affidavit at 29). Thus, such information reveals that the alleged conspirators are not conducting their drug operations covertly and discretely, which would necessitate electronic surveillance, but rather are conducting their drug operations out in the open. Moreover, even though the affiants feel that these buyers would not help in their investigation because they are not members of the alleged conspiracy, traditionally, law enforcement has always used buyers to get to the sellers. Here, the investigators should presumably be able to do the same thing, considering the plethora of buyers and the open nature of the alleged drug conspiracy.

### 2.    Undercover Drug Buys and Buy-Bust Technique

The affiants also claim that these techniques have been ineffective at achieving the goals of the investigation. However, as previously mentioned, the affiants admit to having succeeded in at least two controlled purchases of heroin and at least one controlled

purchase of crack cocaine from Mr. Morris.  (Oct. 21, 2005 Affidavit at 29).

Despite these obvious successes, the affiants claim that they have been unsuccessful in proving "(a) the source of the drugs; (b) the means by which the organization's drugs are obtained; [c] the manner and timetable of heroin and crack cocaine shipments; (d) the locations where illegally obtained assets and drugs are hidden; or (e) the manner in which the co-conspirators conceal their activities and insulate themselves from law enforcement scrutiny."  (Sep. 21, 2005 Affidavit at 24 and Oct. 21, 2005 Affidavit at 29).  The affiant continues that "[s]uch investigation will not reveal his supplier, the person who transports the heroin and crack cocaine to him, any stash locations, nor will it serve to identify other members of this narcotics trafficking network." (Oct. 21, 2005 at 31).

However, such concerns with discovering the supplier of the drugs seem to be contradictory to what the government already knew.  The government had absolutely no need to discover the purported supplier of drugs to Mr. Morris, as the government already had a cooperating witness inform them that the supplier of drugs to Mr. Morris and Mr. Bostick was Mr. Blakney.  (Sep. 21, 2005 Affidavit 16).  Thus, any talk about an investigatory need to discover the supplier of Mr. Morris is false, as the government already had reliable information concerning this.

Moreover, while undercover drug buys may not reveal the locations where illegally obtained assets and drugs are hidden or the manner in which the co-conspirators conceal their activities, neither will electronic surveillance.   No conspirator will reveal such

information over electronic communication devices, and such a fact is essentially admitted by the government. The government states that the conspirators are very surveillance-savvy. In there supposed quest to evade surveillance, none of these co-conspirators would discuss such issues over any electronic communication devices.

### 3.    Search Warrants

The affiants also assert that wiretapping is necessary to further locate the places where the conspirators stash their money and contraband. However, the affiants admit that "they have identified some possible stash locations of lower level coconspirators." (Oct. 21, 2005 Affidavit at 32).

Furthermore, though, the affiants claiming that search warrants are an ineffective investigatory procedure contradicts the history of this investigation. In 1996, police had executed a search warrant at a residence where Mr. Morris was living with Mr. Blakney. The police found 61.82 grams of heroin in the bedroom where Mr. Blakney and Mr. Morris were supposedly sleeping. (Sep. 21, 2005 Affidavit at 8). Furthermore, other executed search warrants have been successful in recovering evidence of drugs and weapons. (Nov. 22, 2005 Affidavit at 16-18). Moreover, in October of 2005, agents seized a car driven by Mr. Morris and seized over $1,300 that was in Mr. Morris' possession. (Nov. 22, 2005 Affidavit at 32). All of this evidence indicates that 1) prior searches and seizures have been successful at recovering evidence, and 2) prior searches and seizures have not alerted the alleged co-conspirators to the police investigation, nor caused the alleged co-conspirators to conceal themselves.

### 4.    Interviews

While the affiants claim that interviews have been ineffective because of the uncooperativeness of the interviewees, an interviewee in 2004 revealed that Blakney was a supplier to Mr. Morris and Mr. Bostick.  Thus, the interviews have seemingly been quite successful in the past, informing the government about the goal of the current investigation, the discovery of the supplier of drugs to Mr. Morris.

Therefore, Mr. Morris has demonstrated that traditional investigatory methods were not inadequate in this investigation, but instead had been extremely successful in the past in developing information and evidence.  There is no indication that these methods of investigation would not have worked in the future, and thus the government had not demonstrated the sufficient necessity of employing electronic surveillance.[2]

---

[2]

 Furthermore, Mr. Morris contends that the affidavits for electronic surveillance made in November and December also fail for the same reasons that the September and October affidavits fail.  These later affidavits concerned the need for wiretapping on Mr. Blakney's cellular and land-line phones, though many of the intercepted conversations included Mr. Morris.  Because his voice was intercepted in many of these calls and because these calls will presumably be offered in evidence against him, Mr. Morris is an aggrieved person under the wiretapping statute and has standing to challenge the sufficiency of the affidavits.  Thus, Mr. Morris contends that traditional investigatory techniques would have been sufficient to uncover the investigatory goals.  As with the electronic surveillance directly targeting him, the electronic surveillance targeting Mr. Blakney was not necessary.

Moreover, though, the basis of these affidavits was the electronic communications that were illegal intercepted from Mr. Morris' phones.  Therefore, Mr. Morris suggests that even if the government had a necessary investigatory reason for the wiretaps on Mr. Blakney's phones, because the wiretapping was based upon illegally obtained communications, the communications obtained from Mr. Blakney's phones should also be suppressed.

### C.    Past Investigations of Drug Distributing Conspiracies Indicate that Electronic Surveillance is Not Necessary

Interestingly, one affiant, Special Agent Daniel C. Sparks, discusses his involvement in "investigating two consecutive long-term, gang-related enterprises which resulted in successful prosecutions of these organization in the United States District Court for the District Court of Columbia." (Sep. 21, 2005 Affidavit at 1).  Special Agent Sparks mentions both United States v. Tommy Edelin, et. al., which was a death penalty prosecution, and United States v. Kevin Gray, et. al., which involved a total of 23 defendants involved in a racketeering conspiracy.  Both prosecutions involved huge complex conspiracies with multiple defendants.  And yet, the government did not resort to using electronic surveillance, but was instead able to successfully prosecute both organizations by using traditional investigatory techniques.

The ability of the government to investigate and prosecute such complex conspiratorial organizations, militates against finding that electronic surveillance was necessary in this case to investigate a much smaller scale conspiracy.

## II.    THE INTERCEPTED COMMUNICATIONS AND THE EVIDENCE DERIVED THEREFROM SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT FAILED TO FOLLOW THE MINIMIZATION REQUIREMENT

The wiretapping statute also has a minimization requirement.  As such, 18 U.S.C. § 2518(5) "requires that every wiretap order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable and shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  Carter, 449 F.3d at 1292.  "Although 'the statute does not forbid

the interception of all nonrelevant conversations,' the government must make reasonable efforts to minimize the interception of such conversations." Id. (quoting Scott v. United States, 436 U.S. 128, 139-40 (1978)).  Furthermore "an order authorizing an interception cannot extend 'for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days.'" Carter, 449 F.3d at 1292 (citing 18 U.S.C. § 2518(5)).

Mr. Morris suggests to the Court that the government has failed the minimization requirement because it has allowed the interception of communications to extend for a period "longer than is necessary to achieve the objective of the authorization."  Id. Essentially, the government at the outset of the wiretapping investigation of Mr. Morris had already achieved the investigatory goal of discovering the purported supplier of drugs, Mr. Blakney, by conducting an interview with a cooperating witness.  (Sep. 21, 2005 Affidavit 16).

Furthermore, by the time of the application for the second wiretap of Mr. Morris' phone on October 21, 2005, the government had already obtained all the information underlying its investigatory goals.  The government had intercepted communications from Mr. Morris' cellular phone from approximately September 21, 2005 to October 21, 2005. The affiant states that "[s]everal phone calls intercepted between Morris and Blakney suggest that Blakney is supplying Morris."  (Oct. 21, 2005 Affidavit at 26).  Furthermore, the affiant states that Antione Jones is believed to be the supplier of cocaine to Morris and that "[a]gents have identified several locations where Morris and other members of the

13

organization may be storing narcotics." (Oct. 21, 2005 Affidavit at 26).

However, the affiant states that the agents are lacking in "physical evidence or cooperator information that can confirm their suspicions." While the agents may have not obtained physical evidence or cooperator information (which is highly doubtful considering the number of undercover buys and reliable cooperating witnesses the agents had), these types of evidence cannot be obtained through continued wiretapping. To obtain the physical evidence, the agents will have to start executing search warrants of the alleged storing locations and executing more undercover drug buys. Furthermore, the agents should execute more buy-busts if they needed to gain more cooperating witnesses. Simply stated, wiretapping would be insufficient in obtaining this type of information. Wiretapping had already taken the investigation as far as it would go without utilizing other investigatory techniques.

Therefore, because the investigating team had probably already obtained its investigatory goal prior to the first application for wiretapping and because the investigating team definitely obtained its investigatory goal by the end of the first wiretapping period, Mr. Morris suggests that the government has failed in the minimization requirement to not extend the wiretapping period beyond the period necessary to achieve the objective of the application.

## CONCLUSION

Because the government has failed to adequately demonstrate the necessity of the wiretapping or the minimization of the interception of communications, Mr. Morris

respectfully moves this court for an order suppressing all of the communications obtained from this illegal wiretapping and for all evidence derived from such communications.

Respectfully Submitted,

**KEVIN MORRIS**
**By Counsel**


_____/s/_____
Pleasant S. Brodnax, III
MOFFITT & BRODNAX
The Mills Building, Suite 400
1700 Pennsylvania Avenue, Ave., NW
Washington, DC 20006
(202) 462-1100
valawyer@erols.com




CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2007, I electronically filed this Motion for Suppression of Communications Unlawfully Intercepted and Evidence Derived from Illegal Electronic Surveillance with the Clerk of Court using the CM/ECF system, which sent notification to counsel of record.

_____/s/_____
Pleasant S. Brodnax, III